# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**10-31**

**STATE OF LOUISIANA**

**VERSUS**

**JONATHAN JUDE GILBERT**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 45353
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and David E. Chatelain,[*] Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**Michael Harson**
**District Attorney, 15th Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**Telephone: (337) 232-5170**
**COUNSEL FOR:**
     **Plaintiff/Appellee - State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**Telephone: (337) 491-0570**
**COUNSEL FOR:**
     **Defendant/Appellant - Jonathan Jude Gilbert**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Laurie A. Hulin**
**Assistant District Attorney - 15th Judicial District Court**
**100 North State Street - Suite 215**
**Abbeville, LA 70510**
**Telephone: (337) 898-4320**
**COUNSEL FOR:**
     **Plaintiff/Appellee - State of Louisiana**

**THIBODEAUX, Chief Judge.**

After a trial, the jury found Defendant, Jonathan Jude Gilbert, guilty of second degree murder. The trial court denied Gilbert's motion for a new trial. Gilbert appealed, claiming the evidence was insufficient to convict him, and the trial court erred by not granting his motion for a new trial and by admitting certain autopsy photographs into evidence. For the following reasons, we affirm.

## I.

## ISSUES

We shall consider whether:

(1) the evidence was insufficient for Defendant's conviction of second degree murder where the victim was shot three times, where the witness who originally identified Defendant as the shooter recanted her testimony, and where another witness came forward several days before trial identifying Defendant as the shooter;

(2) the trial court erred by denying Defendant's motion for a new trial based on new evidence where Defendant discovered that the witness who identified him as the shooter had been a patient at a psychiatric facility; and,

(3) the trial court erred by allowing certain autopsy photographs into evidence.

## II.

## FACTS

On February 28, 2006, at approximately 9:30 p.m., Officer Anthony White was dispatched to the intersection of Vernon and Kibbe Streets in Abbeville, where Jonathan Brown was shot. According to Officer White, there was one street light on the north side of Vernon Street. When Officer White arrived at the

intersection, he saw two females trying to render assistance to Brown, who was lying on the ground and appeared to be in shock.

Dr. Collie Trant, an expert in forensic pathology who performed an autopsy on Brown, testified that Brown died of multiple gunshot wounds, one to the chest and two to the back. Brown had marijuana and ecstasy in his system at the time of his death. DNA samples were taken from the shell casings found on the ground near Brown's body, but Dr. Trant did not testify about the results of the DNA test.

At the scene, Nicole Rice approached the police and stated that she saw what happened and that Defendant shot Brown. She stated she was walking with Brown and then left him to get a soda from the machine nearby when she heard gunshots. Rice stated that a black Grand Am was involved in the shooting. Police obtained arrest warrants for Defendant and his brother, Antonio Gilbert, based on Rice's statements.

At trial, Rice testified that she did not see the car and that she did not see Defendant shoot Brown. She told the police that Defendant shot Brown because she was angry with Defendant, as she thought he had set fire to her brother's home. Rice further stated that Antonio did not pay her to change her testimony. Nevertheless, she admitted that Antonio's friend gave her $500.00.

Shortly after the shooting, two police officers went to a nearby house and spoke with Yvonne Trice. A few days before trial, police called the phone number from which the 911 call came on the night of the shooting and discovered that Trice had called 911. Police then interviewed Trice.

Trice testified that on the date of the shooting, she lived on Vernon Street near where it intersected Kibbe Street, across from a soda machine and the

2

corner. Trice was on the porch at the time of the incident. She testified there may have been three street lights.

Trice stated that she saw a black car Antonio was driving stop on the corner. She also observed a boy walking down the road. She then saw that Defendant got out of the car. The boy put his hands up and said, "don't shoot me." Defendant then shot the boy, got back in the car, and left. Trice subsequently called the police. She identified the black Pontiac Grand Am seized by the police as the car she saw on the night of the shooting.

Trice testified that she did not tell the police what had happened because she was scared and thought the police could not protect her. Trice first told the police what occurred "last year sometime"; however, she did not tell them everything. She testified that she told the police everything during the week before trial. Trice stated that it took her so long to tell the entire story because she felt her life was in danger.

Antonio Gilbert turned himself in the day following the shooting. He told the police that he was out of town when the shooting occurred.

Edith Campbell, Antonio's ex-girlfriend, testified that she and Antonio shared a black Pontiac Grand Am. On the date of the shooting, she and Antonio went to the fair, the parade, and then to her mother's home. While at her mother's house, Edith sent Antonio to get the kids something to eat from their home. Antonio returned and, subsequently, he and his other brother, Jermaine Gilbert, went back to the fair in the black Grand Am. Edith did not recall what time Antonio left; however, it was dark outside. Edith testified that Antonio eventually returned to her mother's, and she and Antonio left. Jermaine drove the two of them in the Grand Am to the home of Antonio's cousin, where Edith and Antonio spent the night. The next time

Edith saw the car was at the police department. Edith testified that she did not see Defendant that evening.

Gwendolyn Campbell, Edith's mother, testified that she lived a couple of blocks from the intersection of Vernon and Kibbe Streets. On the date of the shooting, she arrived home at approximately 7:50 p.m. She saw Antonio at her house approximately ten minutes later. Antonio stayed at her residence for about ten minutes, left, and returned about fifteen minutes later. Jermaine was with Antonio at that time.

**ERROR PATENT**

The court minutes of the voir dire proceeding set forth only eleven jurors, and one alternate. The transcript of the voir dire proceeding indicates that, in addition to those mentioned in the minutes, Herman Borel was a juror on the final selected panel, constituting a total of twelve jurors, which was required. Moreover, according to the transcript, Nell Trahan, not Beatrice Frederick, was the alternate juror.

"[I]t is well settled that when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62 (citation omitted).

Consequently, this court orders the trial court to correct the minutes of the voir dire proceeding to accurately reflect the final composition of the jury and the alternate.

## LAW AND DISCUSSION

### (A) Sufficiency of Evidence

Defendant argues that Rice admitted she lied to the police for a reason—she was angry with Defendant. Further, the State sought to discredit Rice's recantation by alleging that Antonio's friend paid Rice $500.00 to recant, but the State never proved this at trial.

Defendant further asserts that Trice was not a credible witness. She came forward only eleven days before the trial. Additionally, Trice testified there may have been three street lights in the area, and Officer White testified there was only one. Defendant further argues there was some concern as to whether Trice was a former or a current patient at Abbeville General Hospital's Behavioral Medicine Unit and whether she could have seen anyone's face at night from the front porch of her home.

Defendant also mentioned a statement given by a juvenile, J.B., to the police. We shall not discuss Defendant's arguments regarding this statement as J.B. did not testify at trial, and her statement was not admitted into evidence.

Finally, Defendant alleges that DNA recovered from the shell casings found at the scene did not match that of Defendant,[1] and the police did not look for other suspects because they relied on Rice's statement, which she later recanted.

Contrary to Defendant's assertions, we find there was sufficient evidence to convict him. There is sufficient evidence for conviction if the appellate court determines that "the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Hobley*, 98-2460, p. 33 (La.

---

[1]Dr. Trant testified that swabs were taken from the shell casings; however, he did not testify about the results of the DNA test.

12/15/99), 752 So.2d 771, 790, *cert. denied*, 531 U.S. 839, 121 S.Ct. 102 (2000). "[A] single witness's testimony, if believed by the factfinder, is sufficient to support the verdict in the absence of internal contradictions or irreconcilable conflict with the physical evidence." *State v. LaCombe*, 09-544, p. 8 (La.App. 3 Cir. 12/9/09), 25 So.3d 1002, 1007 (citation omitted).

Second degree murder is defined as a killing of a human being when "the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). For example, where the defendant, armed with a gun and standing a short distance from the victim, shot the victim three times in the back, the supreme court held that the "jurors were certainly justified in finding that the defendant had possessed the requisite specific intent to kill or to inflict great bodily harm." *State v. Bright*, 98-398, p. 10 (La. 4/11/00), 776 So.2d 1134, 1141 (citation omitted).

Here, Trice's testimony was sufficient to identify Defendant as the person who shot Brown, regardless of when she reported the information to the police. Whether Trice was a former or current patient at Abbeville General Hospital's Behavioral Medicine Unit was not brought to light at trial and was not considered by the jury. Thus, such evidence cannot be considered by this court when conducting a review of the sufficiency of the evidence.

Further, Brown was shot twice in the back and a third time in the chest. Based on the injuries Brown suffered, the jury was justified in finding Defendant had the specific intent to kill or to inflict great bodily harm. Accordingly, we find there

6

was enough evidence to convince a rational trier of fact that all of the elements of second degree murder were proven beyond a reasonable doubt.

**(B) Motion for a New Trial**

Defendant asserts that Yvonne Trice had a long history of mental/emotional disorders and was, in fact, a patient at Abbeville General Hospital's Behavioral Medicine Unit at the time of the trial. Moreover, Defendant claims he was prevented from finding out where Trice lived after the trial court sustained the State's objection to the defense counsel's question. Further, the subpoena issued for Trice contained only a phone number and was not issued until almost immediately before trial. Defendant asserts that because of the State's actions, defense counsel was prevented from attacking Trice's credibility, thereby denying Defendant the right to effectively confront and cross-examine her.

Defendant further asserts there was newly-discovered evidence presented by Antonio's attorney. The attorney hired a private investigator who went to the scene in the same vehicle alleged to have been used at the time of the shooting and noted that it would be impossible to discern faces from Trice's porch at night. Defendant asserts this is new evidence because the defense counsel was not aware what Trice would testify to, as the defense counsel found out about Trice being a witness less than a week before trial.

Defendant further maintains that the State must have known about Trice's mental issues at the time of the trial because the State was quick to object to the defense counsel's questioning regarding Trice's residence.

Defendant goes on to assert that if this court finds the trial court committed no error, the newly-discovered evidence was highly relevant in determining Trice's credibility. Further, relying on *State v. Robinson*, 01-273 (La.

7

5/17/02), 817 So.2d 1131, Defendant argues the denial of his right to confront Trice violated his rights.

A new trial, based on the discovery of new evidence, shall be granted when: (1) the new evidence was not discovered before or during the trial; (2) the new evidence is material; (3) the evidence was undiscovered not because defendant failed to exercise reasonable diligence; and, (4) if the evidence had been introduced at trial, it would probably have changed the verdict or judgment of guilty. La.Code Crim.P. art. 851(3).

> The test is objective in that the trial judge does not sit as the ultimate arbiter of the resolution of the case once the new evidence is considered, that is, the trial court does not weigh the evidence. The role of the trial court is to review the evidence constituting the State's case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence.

*State v. Watts*, 00-602, p. 7 (La. 1/14/03), 835 So.2d 441, 447 (citation omitted).

Ordinarily, new evidence that affects a witness's credibility does not support a motion for a new trial. *State v. Cavalier*, 96-3052, 97-103 (La. 10/31/97), 701 So.2d 949. "Nevertheless, the court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it 'appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result.'" *Id*. at 951 (quoting *United States v. Davila*, 428 F.2d 465, 466 (9th Cir. 1970)) (citations omitted). Thus,

> [o]ne of the main methods of attack upon the credibility of a witness is to show a defect of capacity in the witness to observe, remember, or recount matters. For this reason, this court has held that mental abnormality, either at the time of observing the facts or at the time of testifying, will be provable on cross-examination or by extrinsic evidence, as bearing on credibility.

*Robinson*, 817 So.2d at 1135 (citations omitted).

At the hearing on the motion for a new trial, the State asserted that it was unaware that Trice had any mental health issues. Defendant presented no evidence to disprove that assertion. The medical records submitted at the hearing on the motion were from April of 2007. Thus, Defendant did not prove Trice was a patient at Abbeville General Hospital at the time of the trial or that she had difficulty understanding events she saw at the time of the shooting or relating her observations at the trial.

At trial, the defense counsel asked Trice where she lived. The trial court sustained the State's objection because Trice had testified that she feared for her life and because it was irrelevant. Defendant cannot prove his right to confront was violated merely because he could not ask Trice where she lived.

Although Defendant asserts that the private investigator's evaluation of the scene and the conclusion that Trice could not have seen Defendant were newly-discovered evidence, neither the investigator nor the attorney who hired him were called as witnesses at the hearing on the motion. Further, Defendant's assertion that the results of the investigation were newly-discovered evidence is incorrect. Defendant admits that he was aware that Trice would testify before the trial began, and the investigator could have gone to the scene prior to the trial or after Trice testified but before the jury rendered its verdict.

Based on the above, the trial court did not err in denying Defendant's motion for a new trial.

## (C) Autopsy Photographs

Prior to trial, the defense counsel filed a motion to exclude autopsy photographs from the evidence. The counsel also objected to the introduction of the photographs at trial. The motion was denied, and the objection should be considered.

Defendant asserts the photographs, State's Exhibit 7, were prejudicial and not necessary, as the defense was willing to stipulate to the cause of death. Further, Defendant maintains the photographs were not needed to prove corpus delecti or to identify the victim, and the probative value of the photographs did not outweigh their prejudicial effect. We disagree.

> The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence.

*State v. Broaden*, 99-2124, pp. 22-23 (La. 2/21/01), 780 So.2d 349, 364, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001) (citations omitted).

> The mere fact that the crime scene photographs are unpleasant, horrifying, or gruesome does not render them inadmissible, nor does the fact that the photographs bring vividly to the jurors the details of a shocking crime. The key is that the probative value of the photographs outweighs their prejudicial effect.

*State v. Thibodeaux*, 97-1636, pp. 9-10 (La.App. 3 Cir. 11/18/98), 728 So.2d 416, 422, *writ denied*, 98-3131 (La. 5/7/99), 741 So.2d 27, *cert. denied*, 528 U.S. 936, 120 S.Ct. 341 (1999). Thus, "[a]n offered stipulation bears upon this balancing test, but the decision is primarily one for the trial court. The state cannot be robbed of the moral force of its case merely because the stipulation is offered." *State v. Watson*, 449 So.2d 1321, 1326 (La.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939 (1985)

(citations omitted).  *See also State v. Perry*, 502 So.2d 543 (La.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205 (1987); *State v. Ball*, 99-428 (La. 11/30/99), 756 So.2d 275.

For example, the supreme court held that the trial court did not err when it admitted photographs depicting the nude body of the victim lying on her back on an autopsy table.  *State v. Lindsey*, 404 So.2d 466 (La.1981).  Also, the photographs depicted the victim's head and upper torso with a trickle of dried blood streaked on her face, and the victim from head to knee revealing a sutured incision made in her torso as part of the autopsy.  There, in an attempt to prevent the admission of these photographs into evidence, the defendant recounted his earlier admission to the correctness of the autopsy report establishing the cause of death and identity of the victim.  Nevertheless, the supreme court wrote that these photographs "identify the victim, corroborate the fact of death, and press home the fact that the case deals with a concrete event, the killing of a flesh and blood human being."  *Id.* at 475-76.  The court noted that while these photographs were not pleasant, they were not particularly gruesome because "[n]either photo depicts more blood than might result from a minor cut or nosebleed.  The pictures were taken in a 'sterile' environment, detached from the immediacy of the scene where the fatal injury was inflicted."  *Id.* at 476.  Thus, the probative value of the photographs outweighed their possible inflammatory effect.

Here, State's Exhibit 7 consists of two photographs.  One photograph depicts the victim lying on his back with two wounds to the upper chest area.  In the second photograph, the victim is face down and three wounds to the back are depicted.  Each photograph was taken from the waist up, and a minimal amount of blood is visible.

Like the supreme court in *Lindsey*, 404 So.2d 466, we do not find these photographs to be so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. Despite Defendant's offer to stipulate to the cause of death, the photographs were used to show the jury the injuries suffered by the victim. Thus, the probative value of the photographs is not substantially outweighed by any prejudicial effect they may have had on the jury. Therefore, the trial court did not abuse its discretion by admitting the photographs into evidence.

## CONCLUSION

Defendant's conviction is affirmed. This court orders the trial court to correct the minutes of the voir dire proceeding to accurately reflect the final jury panel and the alternate.

**AFFIRMED WITH INSTRUCTIONS.**